## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA

### CHARLESTON DIVISION

**DAVID A. CASTLE,**

      **Plaintiff,**

**v.**                        **Case No.: 2:15-cv-15251**

**CAROLYN W. COLVIN,**
**Acting Commissioner of the**
**Social Security Administration,**

      **Defendant.**


### PROPOSED FINDINGS AND RECOMMENDATIONS

This action seeks a review of the decision of the Commissioner of the Social Security Administration (hereinafter "Commissioner") denying Plaintiff's application for a period of disability and disability insurance benefits ("DIB") under Title II of the Social Security Act, 42 U.S.C. §§ 401-433. The matter is assigned to the Honorable John T. Copenhaver, Jr., United States District Judge, and was referred to the undersigned United States Magistrate Judge by standing order for submission of proposed findings of fact and recommendations for disposition pursuant to 28 U.S.C. § 636(b)(1)(B). Presently before the Court are the parties' cross motions for judgment on the pleadings as articulated in their briefs. (ECF Nos. 11, 12, 15).

The undersigned has thoroughly considered the evidence and the applicable law. For the following reasons, the undersigned **RECOMMENDS** that the presiding District Judge **GRANT** Plaintiff's Motion for Judgment on the Pleadings, to the extent that it requests remand of the Commissioner's decision, (ECF No. 11); **DENY** Defendant's request to affirm the decision of the Commissioner, (ECF No. 12); **REVERSE** the final

decision of the Commissioner**; REMAND** the matter for further proceedings pursuant to sentence four of 42 U.S.C. § 405(g); and **DISMISS** this action**, with prejudice,** and remove it from the docket of the Court.

## I.   Procedural History

On September 10, 2012, Plaintiff, David W. Castle ("Claimant"), completed an application for DIB, alleging a disability onset date of May 30, 2012, due to "right shoulder pain, bilateral ankle pain, lower back pain, sleep apnea, post-traumatic stress disorder ("PTSD"), [and] Irritable bowl [*sic*] syndrome ("IBS"). (Tr. at 147, 168). His application was denied initially and upon reconsideration. (Tr. at 13). Claimant requested and received a hearing before the Honorable Peter Jung, Administrative Law Judge ("ALJ"), who determined on April 30, 2014 that Claimant was not disabled under the Social Security Act. (Tr. at 13-26). The ALJ's decision became the final decision of the Commissioner on September 25, 2015, when the Appeals Council denied Claimant's request for review. (Tr. at 1-4). Claimant timely filed the present civil action seeking judicial review pursuant to 42 U.S.C. § 405(g). (ECF No. 1). The Commissioner filed an Answer and a Transcript of the Administrative Proceedings. (ECF Nos. 7, 8). Claimant filed a Brief in Support of Judgment on the Pleadings, and Defendant filed a Brief in Support of Defendant's Decision, to which the Claimant filed a Reply. (ECF Nos. 11, 12, 15). Consequently, the matter is ready for resolution.

## II.   Claimant's Background

Claimant was 46 years old at the time he filed the instant application for benefits and 47 years old at the time of the ALJ's decision. (Tr. at 13, 147). Claimant is a high school graduate and communicates in English. (Tr. at 169). His prior relevant work experience includes a job as a United States Postmaster. (Tr. at 37, 169). Claimant also served

approximately six and a half years in the military. (Tr. at 513).

**III.   Summary of ALJ's Decision**

Under 42 U.S.C. § 423(d)(5), a claimant seeking disability benefits has the burden of proving a disability. *See Blalock v. Richardson,* 483 F.2d 773, 774 (4th Cir. 1972). A disability is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable impairment which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A).

The Social Security regulations establish a five-step sequential evaluation process for the adjudication of disability claims. If an individual is found "not disabled" at any step of the process, further inquiry is unnecessary and benefits are denied. 20 C.F.R. § 404.1520. The first step in the sequence is determining whether a claimant is currently engaged in substantial gainful employment. *Id.* § 404.1520(b). If the claimant is not, then the second step requires a determination of whether the claimant suffers from a severe impairment. *Id.* § 404.1520(c). If severe impairment is present, the third inquiry is whether this impairment meets or equals any of the impairments listed in Appendix 1 to Subpart P of the Administrative Regulations No. 4 (the "Listing"). *Id.* § 404.1520(d). If the impairment does, then the claimant is found disabled and awarded benefits.

However, if the impairment does not meet or equal a listed impairment, the adjudicator must determine the claimant's residual functional capacity ("RFC"), which is the measure of the claimant's ability to engage in substantial gainful activity despite the limitations of his or her impairments. *Id.* § 404.1520(e). After making this determination, the next step is to ascertain whether the claimant's impairments prevent the performance of past relevant work. *Id.* § 404.1520(f). If the impairments do prevent the performance of past relevant work, then the claimant has established a *prima facie* case of disability,

and the burden shifts to the Commissioner to demonstrate, as the final step in the process, that the claimant is able to perform other forms of substantial gainful activity, when considering the claimant's remaining physical and mental capacities, age, education, and prior work experiences. 20 C.F.R. § 404.1520(g); *see also McLain v. Schweiker,* 715 F.2d 866, 868-69 (4th Cir. 1983). The Commissioner must establish two things: (1) that the claimant, considering his or her age, education, skills, work experience, and physical shortcomings has the capacity to perform an alternative job, and (2) that this specific job exists in significant numbers in the national economy. *McLamore v. Weinberger,* 538 F.2d. 572, 574 (4th Cir. 1976).

When a claimant alleges a mental impairment, the SSA "must follow a special technique at every level in the administrative review," including the review performed by the ALJ. 20 C.F.R. § 404.1520a. First, the ALJ evaluates the claimant's pertinent signs, symptoms, and laboratory results to determine whether the claimant has a medically determinable mental impairment. *Id.* § 404.1520a(b). If such impairment exists, the ALJ documents his findings. Second, the ALJ rates and documents the degree of functional limitation resulting from the impairment according to criteria specified in 20 C.F.R. § 404.1520a(c). Third, after rating the degree of functional limitation from the claimant's impairment(s), the ALJ determines the severity of the limitation. A rating of "none" or "mild" in the first three functional areas (activities of daily living, social functioning, and concentration, persistence or pace) and "none" in the fourth (episodes of decompensation) will result in a finding that the impairment is not severe unless the evidence indicates that there is more than minimal limitation in the claimant's ability to do basic work activities. *Id.* § 404.1520a(d)(1). Fourth, if the claimant's impairment is deemed severe, the ALJ compares the medical findings about the severe impairment and

the rating and degree and functional limitation to the criteria of the appropriate listed mental disorder to determine if the severe impairment meets or is equal to a listed mental disorder. *Id.* § 404.1520a(d)(2). Finally, if the ALJ finds that the claimant has a severe mental impairment, which neither meets nor equals a listed mental disorder, the ALJ assesses the claimant's residual function. *Id.* § 404.1520a(d)(3).

Here, the ALJ determined as a preliminary matter that Claimant met the insured status for disability insurance benefits through December 31, 2016. (Tr. at 15, Finding No. 1). At the first step of the sequential evaluation, the ALJ confirmed that Claimant had not engaged in substantial gainful activity since May 30, 2012, the alleged disability onset date. (*Id.*, Finding No. 2-3). At the second step of the evaluation, the ALJ found that Claimant had the following severe impairments: "degenerative disc disease, sleep apnea, right shoulder pain syndrome, bilateral ankle pain syndrome, bilateral knee pain syndrome, irritable bowel syndrome, anxiety disorder and depression." (Tr. at 16-18, Finding No. 3).

Under the third inquiry, the ALJ found that Claimant did not have an impairment or combination of impairments that met or medically equaled any of the impairments contained in the Listing. (Tr. at 18-21, Finding No. 4). Accordingly, the ALJ determined Claimant's RFC, concluding that he had:

> [T]he residual functional capacity to perform a full range of work at all exertional levels but with the following nonexertional limitations: he can lift and carry 20 pounds occasionally, 10 pounds frequently, stand/walk 6 hours and sit 6 hours in an 8-hour workday. He can never climb ladders, ropes, or scaffolds, but can occasionally climb ramps and stairs, balance, stoop, kneel crouch, and crawl. He is limited to frequently using his dominant, right upper extremity overhead and to the front and laterally. He must avoid concentrated exposure to extreme cold, extreme heat, wetness, vibration, fumes, odors, dusts, gases, and poor ventilation, as well as hazards, machinery and heights. The claimant is limited to simple, repetitive, routine tasks performed at a reasonable pace in settings with few

5

distractions that do not require meeting production line schedules.

(Tr. at 21-24, Finding No. 5). At the fourth inquiry, with the assistance of a vocational expert, the ALJ found that Claimant was unable to perform his past relevant work. (Tr. at 24-25, Finding No. 6). Therefore, under the fifth and final inquiry, the ALJ reviewed Claimant's past work experience, age, and education in combination with his RFC to determine his ability to engage in substantial gainful activity. (Tr. at 25-26, Finding Nos. 7-10). The ALJ considered that (1) Claimant was born in 1966, and was defined as a younger individual age 18-49 on the alleged disability onset date; (2) he had at least a high school education and could communicate in English; and (3) transferability of job skills was not material to the disability determination because the Medical-Vocational Rules supported a finding that Claimant was "not disabled," regardless of his transferable job skills. (Tr. at 25, Finding Nos. 7-9). Given these factors, Claimant's RFC, and the testimony of a vocational expert, the ALJ determined that Claimant could perform jobs that existed in significant numbers in the national economy, including work as a non-postal mail clerk, layaway clerk, and office assistant at the light, unskilled level, as well as a call out operator, document preparer, and surveillance systems monitor at the sedentary exertional level. (Tr. at 25-26 Finding No. 10). Therefore, the ALJ found that Claimant was not disabled as defined in the Social Security Act through the date of the decision. (Tr. at 26, Finding No. 11).

## IV.   Claimant's Challenge to the Commissioner's Decision

Claimant raises one challenge to the Commissioner's decision. Claimant contends that the ALJ committed reversible error by failing to consider and weigh Claimant's disability ratings issued by the Department of Veterans Affairs ("VA"). According to Claimant, the VA initially awarded him a permanent 70% service-connected disability

rating based on his major depressive disorder, limited motion of arm, impairment of the clavicle or scapula, paralysis of the posterior tibial nerves, and paralysis of the twelfth cranial nerve. In 2013, Claimant's service-connected disability rating was increased by the VA to 80% based on his irritable colon, major depressive disorder, limited motion of the arm, paralysis of posterior tibial nerves, paralysis of twelfth cranial nerve, and impairment of clavicle or scapula. Claimant argues that the ALJ was bound by the decision of the United States Court of Appeals for the Fourth Circuit ("Fourth Circuit") in *Bird v. Comm'r of Soc. Sec.*, 699 F.3d 337 (4th Cir. 2012), which required the ALJ to give VA disability ratings substantial weight unless the record clearly demonstrated that the ratings deserved less than substantial weight. Moreover, the ALJ was required to explain his treatment of the VA ratings in the written decision. Claimant contends that, notwithstanding these requirements, "it is clear from the four corners of the ALJ's decision that the ALJ did not acknowledge, consider, or weigh the VA ratings decision." (ECF No. 15 at 2).

In response, the Commissioner provides several reasons for the Court to conclude that the ALJ complied with applicable law governing the weight to afford disability ratings issued by the VA. (ECF No. 12). First, the Commissioner argues that, contrary to Claimant's contention, the ALJ did consider and weigh the VA disability ratings. The Commissioner emphasizes that the ALJ reviewed all of Claimant's records from the VA, including the records that mentioned Claimant's disability ratings. However, the ALJ explicitly discounted records prepared before the date of Claimant's alleged onset of disability, because they involved a "time during which the claimant was not eligible to receive benefits." (*Id.* at 9). The Commissioner notes that the VA disability ratings were issued prior to Claimant's alleged onset of disability and during a period when Claimant

7

was working full-time.

Second, the Commissioner points out that the VA awarded Claimant only partial disability. The Commissioner maintains that an ALJ's duty under *Bird* to consider and weigh VA disability ratings issued by the VA is not present in cases of partial disability, because "there is no analogue to 'partial' disability in the Social Security disability system." (*Id.* at 11). In addition, the Commissioner cites to case law from another circuit, which posits that partial disability ratings generated years before the alleged onset of disability need not be considered by an ALJ.

Third, the Commissioner argues that Claimant does not properly present a *Bird* issue, because he has never tendered the VA's Rating Decision. Without a decision explaining the basis of the VA's findings, the ALJ was prevented from effectively considering and weighing the merit of the VA's numerical ratings. The Commissioner stresses that Claimant has been represented by counsel throughout these proceedings and, yet, has never submitted the Ratings Decision for consideration. According to the Commissioner, the ALJ had the right to presume that Claimant's counsel had presented Claimant's best case; accordingly, the ALJ had no obligation to look beyond the records submitted by Claimant.

Finally, the Commissioner argues that remand is unnecessary in this case, because the ALJ discussed all of the pertinent medical evidence, including portions of the records underlying the VA disability ratings. The Commissioner indicates that Claimant has not shown how the ALJ's failure to more fully discuss the ratings, themselves, has prejudiced that analysis or undermined the ALJ's determination of non-disability. The Commissioner adds that the Rating Decision is not in the record; therefore, a remand for the ALJ to more fully consider the bare numerical ratings would be a waste of time and

resources.

## V.   **Relevant Medical History**

The undersigned has reviewed the evidence in its entirety, including all of the medical records. However, given the specificity of Claimant's challenge to the ALJ's decision, only records most central to the dispute are discussed below.

### A. Treatment Records from the Veteran's Administration Medical Center

The oldest record in evidence reflecting Claimant's treatment through the VA is a general medicine compensation and pension ("C&P") examination performed on December 1993 by Dr. Gregory Chaney. (Tr. at 513-30). According to the C&P, Claimant was a 27-year-old veteran, having served in the military from April 1987 to November 1993. (Tr. at 513). Claimant's current complaints were right shoulder pain and weakness; status post left scapular fracture; bilateral ankle pain that was constant with all movements and use; and numbness of the tongue secondary to oral surgery. Dr. Chaney completed a thorough physical examination of Claimant and assessed him with status post scapular fracture of the left shoulder; right shoulder pain with full range of motion and normal strength; chronic back pain with normal range of motion and no radiological abnormalities; chronic bilateral ankle pain with normal range of motion and normal x-rays; and history of nerve damage to the right side of the tongue related to dental extraction, "which is anatomically improbable." (Tr. at 516).

The first treatment record available from the VA is dated May 13, 1996. (Tr. at 785-86). On that day, Claimant presented to the Veteran's Affairs Medical Center ("VAMC") to be fitted for an ankle brace related to degenerative joint disease in both ankles. (Tr. at 786). According to the office record, by this time, Claimant had been issued a 70% service-

connected disability rating by the VA, which was based upon individual ratings given for major depressive disorder (30%), limited motion of arm (20%), clavicle or scapula impairment (10%), paralysis of the bilateral posterior tibial nerves (10% for each side), and paralysis of the twelfth cranial nerve (10%). (*Id.*)

On February 11, 1999, Claimant underwent another C&P examination specifically targeted at his shoulder, elbow, wrist, hip, knee, and ankle joints, which appears to have been performed by Dr. S. Shy. (Tr. at 503-08). According to the C&P form, a bone scan reflected that Claimant had degenerative joint disease ("DJD") in his ankles, knees, and shoulders. (Tr. at 503). He wore a brace on his left ankle and another brace on his right knee. Claimant described his DJD as severely limiting his daily activities and occupation, and complained that his pain increased with walking, bending, and stooping. (Tr. at 503-04). Dr. Shy diagnosed severe DJD by history and questioned whether Claimant had a neuromuscular disorder. (Tr. at 507).

On March 1, 2000, Claimant underwent a general medicine C&P evaluation. (Tr. at 1121). Dr. John Pecora recorded a brief and targeted physical examination of Claimant, noting that Claimant wore a short-leg brace on the left ankle, and a long leg brace on the right lower extremity. His extremities had a full range of motion; however, his right shoulder strength was decreased at 3+/5, his left shoulder was 4/5, and his ankles and knees, bilaterally, were 4/5. Dr. Pecora believed that Claimant had an undiagnosed neuromuscular disease and needed to be further evaluated with an EMG and neurology consultation. (*Id.*).

On March 16, 2000, Claimant was scheduled for an EMG study with Dr. Nirmala Singh due to pain of the shoulder joints, ankle joints, and feet joints; however, Dr. Singh noted that he had performed these studies on Claimant's lower extremities in 1998, and

10

found evidence of mild tarsal tunnel syndrome. Dr. Singh decided to defer EMG testing on this date, documenting that he would reschedule at a later date if he found it to be necessary.

The following day, Dr. Jordan Brooks performed a neurology C&P examination. (Tr. at 1117-19). As far as history, Dr. Brooks indicated that Claimant first began to experience ankle pain in 1992. He also developed tingling in his feet that spread to his ankles. (Tr. at 1118). Claimant subsequently developed back, knee, and shoulder pain. At the time of the evaluation, Claimant was working as a postal officer. Claimant complained that he was required to stand during much of the eight-hour shift, which caused him to have pain in both ankles, both knees, and his lower back. He confirmed that he had worn leg braces since 1994. On examination, Claimant's motor strength and coordination were normal. (Tr. at 1119). He had some inconsistent diminished sensation to pinprick, his deep tendon reflexes were 2/4, and his gait was steady, but antalgic. Claimant's laboratory testing for neuromuscular diseases was normal. Dr. Brooks's impression was diffuse joint pain without evidence of neuromuscular disease. (*Id.*).

On October 18, 2007, Claimant appeared for another general medicine C&P examination performed by Sylvia Gardner, a nurse practitioner. (Tr. at 1080-90). Nurse Gardiner reviewed Claimant's history of feet and ankle symptoms, documenting that his symptoms had gotten progressively worse. (Tr. at 1081). Claimant described the pain in his ankles as constant and stated that it caused his ankles to give out. Claimant had used various braces on his knees to relieve the ankle pain, but they did not help. Claimant also described pain in his left shoulder that had progressively worsened. (Tr. at 1082). When asked how these conditions affected him functionally, Claimant stated that he could stand 3 to 8 hours with short rest periods and could walk less than a mile before having to stop.

(Tr. at 1082-83). On examination, Nurse Gardner found evidence of abnormal weight-bearing with associated abnormal shoe-wearing. (Tr. at 1084). Nurse Gardner did range-of-motion testing and ordered x-rays, which showed normal joints spaces in the ankles, and a normal shoulder with the exception of AC joint degeneration. Upon completing the assessment, Nurse Gardner opined that Claimant's left ankle arthralgia had a significant effect on his occupational function and a moderate impact his ability to carry out some of his daily activities, such as chores, shopping, and exercise. (Tr. at 1088). Claimant's left ankle also prevented him from engaging in sports and recreation. Claimant's right ankle arthralgia likewise significantly impacted his ability to carry out work functions and affected his daily activities in the same manner as his left ankle condition. (Tr. at 1089). Claimant's shoulder impairment had a significant impact on his ability to lift, carry, and reach and a moderate impact on his ability to do chores and shop. Nurse Gardner felt that Claimant needed to avoid repetitive motions and jobs requiring mail sorting. (*Id.*).

On April 7, 2008, Claimant underwent a comprehensive mental health evaluation for complaints related to his service in Iraq. (Tr. at 1039). Claimant was diagnosed with depression, not otherwise specified ("NOS") and PTSD symptoms. (Tr. at 1044). His Global Assessment of Functioning ("GAF") score was 54.[1]

Claimant continued to carry a service connected disability rating throughout 2007 and 2008, which remained unchanged at 70%. (Tr. at 663-54, 668-69, 673-77, 681,684-

---

[1] The Global Assessment of Functioning ("GAF") Scale is a 100-point scale that rates "psychological, social, and occupational functioning on a hypothetical continuum of mental health-illness," but "do[es] not include impairment in functioning due to physical (or environmental) limitations." *Diagnostic Statistical Manual of Mental Disorders*, Americ. Psych. Assoc, 32 (4th Ed. 2002) ("DSM-IV"). On the GAF scale, a higher score correlates with a less severe impairment. It should be noted that in the latest edition of the *Diagnostic and Statistical Manual of Mental Disorders*, DSM-5, the GAF scale was abandoned as a measurement tool. A GAF score between 51 and 60 indicates "Moderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) OR moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or co-workers)." DSM-IV at 34.

85, 687-89, 691-96). Claimant returned to the VAMC on July 15, 2008 for electrodiagnostic evaluation of his right shoulder by Dr. Ramon Lansang, a physical medicine specialist. (Tr. at 677-79). Dr. Lansang performed the EMG and found abnormal results, which indicated the presence of right-sided median nerve mononeuropathy at the wrist consistent with carpal tunnel syndrome. The following month, on August 28, 2008, Dr. Waldron requested a TENS unit be issued to Claimant for treatment of shoulders, knees and other painful joints. (Tr. at 684-85). On September 29, 2008, new knee and ankle braces were also ordered for Claimant. (Tr. at 689).

Claimant continued to retain his 70% service connected disability rating throughout 2009 and 2010. (Tr. at 671-72, 699- 720, 724, 726-37, 738-42, 886-87). On November 18, 2009, Claimant underwent a depression screen by Melissa Lewis, Licensed Clinical Social Worker. Claimant reported having depression intermittently for several years beginning shortly after his discharge from the military. Claimant was prescribed Clonazepam at one point; however, it did not provide relief of his symptoms. Claimant told Ms. Lewis he felt depressed due to not being able to play ball with his children although he also reported serving as a sports coach for Boone County Schools. Upon evaluation, Claimant appeared alert and oriented although slightly anxious. His mood and affect were positive and he maintained good eye contact during the evaluation. Claimant did not appear depressed and he demonstrated intact memory. Claimant appeared to ambulate independently. Claimant was assessed with depression and received a GAF score of 70.[2] (Tr. at 714-16).

On March 19, 2010, Claimant underwent a comprehensive general medicine C&P

---

[2] A GAF score between 61 and 70 indicates "[s]ome mild symptoms (e.g., depressed mood and mild insomnia) OR some difficulty in social, occupational, or school functioning (e.g., occasional truancy, or theft within the household), but generally functioning pretty well, has some meaningful interpersonal relationships." DSM–IV at 34.

examination performed by Dr. Gene Duncan. (Tr. at 927-80). Dr. Duncan listed Claimant's problems as fatigue, headaches, dizziness, loss of muscle control, memory loss, muscle pain, ankle pain, knee pain, lower back pain, bilateral shoulder pain, difficulty breathing, sleep disturbance, and bowel issues. In regard to his fatigue, Claimant described being unable to do the things that he used to be able to do. (Tr. at 928). He felt his fatigue was getting worse, although he was sleeping better with the use of a CPAP machine. Claimant connected his complaint of headaches to his neck position, indicating that when he held his neck in flexion for long periods of time, he would experience headaches. The headaches resolved when he rested with his head in an upright position. (Tr. at 929). With respect to dizziness, Claimant stated that he occasionally felt dizzy and lightheaded when he stood up from a lying or sitting position. Claimant explained his complaint of "lost muscle control" as experiencing a jerking motion of his legs when he sat in a recliner at night. However, the symptoms stopped when Claimant walked. Claimant confirmed that he used leg braces only about three days a week. He used to use the braces daily, but when he started to have muscle wasting, he decided to use the braces less often. Claimant described his "memory loss" as a loss of attention and "zoning" out. (Tr. at 930). Claimant complained of having muscle pain in his calves related to his leg braces, but needed to wear the braces for his ankle pain. Claimant felt his ankle and knee pain was getting progressively worse, and he felt his ankles were growing weaker with time. (Tr. at 931). In regard to his lower back pain, Claimant stated that he used a TENS unit, which helped, and he took three to five hydrocodone tablets per day. (Tr. at 932). Claimant also provided Dr. Duncan with the history of his shoulder pain, including having surgery on his right shoulder for a tear and having suffered fractures in his left shoulder. (Tr. at 932-33). Claimant indicated that he still had pain in the shoulders; particularly,

when reaching above his shoulders. As for the breathing difficulties, Claimant believed they were related to gastroesophageal reflux. Claimant stated that his problems with sleep had improved with the use of a CPAP machine, and his bowel issues were stable. (Tr. at 933-34).

After gathering this information, Dr. Duncan reviewed Claimant's treatment history and completed a review of systems. He then performed a physical examination. (Tr. at 941-52). Claimant's blood pressure was within the normal range; he was moderately obese, but had no obvious deformities. Claimant's gait and posture were normal. (Tr. at 941). His ears, nose, sinuses, mouth, throat, neck and endocrine system were normal. (Tr. at 942-43). Claimant had abnormal breath sounds, but his cardiac system was normal. His gastrointestinal, genitourinary, and lymphatic systems were generally normal, as well. (Tr. at 943-44). Dr. Duncan performed a detailed musculoskeletal examination. Claimant's straight leg-raising test was normal and his spine had no obvious deformities. Claimant's motor examination showed normal muscle tone with no evidence of atrophy. (Tr. at 945-46). His extremities had normal sensation, and his reflex examination was normal. (Tr. at 947-48). Claimant's range of motion of his spine was considered to be within the normal range. His feet appeared normal, although his arches were noted to be very high bilaterally. (Tr. at 949). Claimant's right hand was normal, but his left hand had no flexion of the left ring finger due to a high school football injury. The examination of Claimant's extremities was normal except for the presence of varicose veins bilaterally. (Tr. at 950). The remainder of Claimant's examination was normal.

Dr. Duncan ordered laboratory tests and x-rays, which were unremarkable, although the lumbar spine series showed osteophyte formation and mild scoliosis. (Tr. at 952-53). Upon completion of the studies, Dr. Duncan diagnosed Claimant with mild

degenerative disc disease of the lumbar spine causing decreased mobility, weakness, and fatigue. (Tr. at 954). He felt Claimant's spine would interfere with exercise and recreational activities, but would only mildly affect his daily activities. Claimant also had some involuntary muscle twitching, but it was not disabling. (Tr. at 954-55). Dr. Duncan opined that Claimant's short term memory loss, sleep apnea, PTSD, and depression were not diagnoses, but were symptoms associated with his other medical conditions. (Tr. at 955).

Dr. Duncan did a separate assessment of Claimant's shoulder, elbow, wrist, hip, knee, and ankle joints. (Tr. at 956-79). He confirmed that Claimant had a weight-bearing joint affected, but his gait was normal. Dr. Duncan's examination of Claimant's right knee revealed crepitus; his right and left shoulders snapped and popped with motion and were weak. (Tr. at 961-62). Range of motion testing was within normal limits. X-rays showed AC degeneration of both shoulders and mild narrowing of the medial compartment of both knees. (Tr. at 964). Dr. Duncan diagnosed Claimant with tarsal tunnel syndrome of his ankles and early degenerative arthritis of the knees. Dr. Duncan opined that Claimant would have some impairment of daily activities related to these conditions. (Tr. at 965). With respect to Claimant's shoulders, Dr. Duncan believed the degeneration of the AC joints and supraspinatus tendinopathy would limit Claimant's ability to reach, lift, and carry. (Tr. at 966). As far as Claimant's other symptoms and complaints, Dr. Duncan stated that Claimant was out-of-shape due to his chronic ankle and foot pain, and this caused fatigue syndrome, with muscle weakness, headaches, and forgetfulness. However, Dr. Duncan did not find the condition to be disabling in view of Claimant's fulltime work schedule as a postmaster. (Tr. at 972).

On June 16, 2010, Claimant was fitted for new feet, ankle and knee braces. (Tr. at

733-34). One month later, on July 27, Claimant underwent a cystoscopy. The results were normal overall with occasional diverticulas seen in the biopsy. Claimant was advised to have a repeat procedure in seven to ten years. (Tr. at 737). On August 31, 2010, Claimant underwent a colonoscopy. (Tr. at 738-39). The results were suggestive of IBS although the possibility of low grade microscopic colitis could not be ruled out. Claimant was advised to begin a low dose of Imodium daily.

Throughout 2011 and 2012, Claimant continued to carry a 70% service connected disability rating. (Tr. at 322-24, 330, 651-60, 661-62, 746-50, 753, 755-56, 759-62). On On March 8, 2012, Claimant was seen for an orthopedic consultation due to right shoulder pain and status post rotator cuff repair. (Tr. at 656-57). Physical therapy was recommended to increase strength, range of motion, and provide pain relief. By May 15, 2012, Claimant continued to have shoulder issues. (Tr. at 655-56). The medical provider noted a re-evaluation of the shoulder could be done; however, the last time Claimant was seen, the medical provider did not believe shoulder surgery would correct the problem. Claimant continued with physical therapy through September 2012. (Tr. at 330-31, 651-56). Claimant returned on October 26, 2012 for an MRI of the left shoulder due to complaints of shoulder pain. (Tr. at 320-21). The MRI revealed tendinopathy with greater than fifty percent partial thickness tear of the distal supraspinatus tendon; however, there was no evidence of full thickness tear. There also appeared fluid in the subcoracoid bursa. The radiologist questioned whether this was related to the rotator cuff tear pathology, bursitis, or a physiologic phenomenon.

Beginning in January 2013, Claimant's service connected disability rating increased to 80%, based upon irritable colon at 30%, major depressive disorder at 30%, limited motion of the arm at 20%, paralysis of the posterior tibial nerves at 10% each, paralysis

of the twelfth cranial nerve at 10%, and clavicle or scapula impairment at 10%. (Tr. at 1245). On September 12, 2013, Claimant returned to the VAMC for an orthopedic consultation. (Tr. at 1232-33). Claimant presented with a history of knees and ankle pain which had been ongoing for years, although there was no associated history of injury. Claimant wore a long brace on his right leg with knee hinges and a short brace on the left leg. Dr. Ernesto Nieto, an orthopedic surgeon, performed an examination of Claimant's knees and ankles. His knees and ankles appeared stable with normal range of motion; however, Claimant was in considerable pain. X-rays of his knees were normal with no evidence of degenerative joint disease and x-rays of his ankles revealed moderate osteoarthritis. Claimant received an injection to both knees and was advised to continue taking his current medications. Claimant was assessed with arthralgia to both knees and osteoarthritis to both ankles.

On October 2, 2013, Claimant was measured for a Donjoy everyday knee brace due to knee arthralgia. (Tr. at 1228-29). Later that month, Claimant was reevaluated for ongoing left knee pain and was found to have a torn medial meniscus. (Tr. at 1297). Dr. Nieto performed an arthroscopy on Claimant's left knee in November 2013. The surgery revealed the torn meniscus and grade 4 chondromalacia patella. (Tr. at 1266). Claimant did well during the procedure. On December 30, 2013, Claimant returned to the VAMC for fitting of a left knee brace. (Tr. at 1220-22)

Claimant's disability rating remained unchanged at 80% throughout February 21, 2014. (Tr. at 1219-23, 1227-31, 1233-44, 1247-49). Claimant was seen on February 21, 2014 for follow-up to mental health treatment. (Tr. at 1247-48). Claimant received outpatient mental health treatment approximately fourteen years prior; however, he had never had any inpatient psychiatric hospitalizations. Claimant reported that Effexor

18

helped his mood, noting his energy level was "up a little bit" although his endurance was slightly down. Claimant reported he was busy with family activities with his four children. At this visit, Claimant's medication regimen included Diclofenac, Lisinopril, Hydrocodone, Loperamide, Omeprazole, and Venlafaxine. Upon examination, Claimant was alert and oriented with good eye contact and normal speech rate. His mood appeared euthymic and he demonstrated a congruent affect along with fair insight and judgment. Claimant was assessed with unspecified depressive disorder. He was advised to continue taking Effexor, continue with individual psychotherapy, and return in three months for further medication evaluation and supportive psychotherapy.

### B. Agency Evaluations

On November 19, 2012, Kara Gettman-Hughes, M.A., completed a Mental Status Examination at the request of the West Virginia Disability Determination Service. (Tr. at 270-77). Claimant's main complaint was pain described as constant, resulting in functional limitations. He also complained of sadness, helplessness, hopelessness, failure, guilt and loss of interest over the past year. Claimant told Ms. Gettman-Hughes he cried easily, felt fatigued and suffered sleep issues. In addition, Claimant worried excessively and became easily frustrated, irritable, and restless, which caused muscle tension. (Tr. at 271).

Claimant reported he had occasionally received mental health treatment at the VAMC over the years, initially for sleep impairment; however, he had never been hospitalized for mental health issues. (Tr. at 272). Upon examination, Claimant was cooperative with good eye contact. He appeared oriented to time, person, place and date. Claimant displayed an anxious mood and reactive affect. Claimant's thought processes and content were normal. His immediate and recent memory was intact and his remote

memory was fair based upon his ability to recall personal history details. Claimant's concentration was intact; however, his persistence was mildly impaired and pace was variable. Claimant's social function was mildly impaired.

Claimant reported being able to perform activities of daily living including some microwave cooking, laundry, and light household chores although he required frequent rest breaks. Claimant shopped once every two weeks, periodically visited neighbors, but could no longer hunt, fish or exercise. (Tr. at 274). Ms. Gettman-Hughes diagnosed Claimant with pain disorder associated with both psychological factors and general medical condition, major depressive disorder, single episode, moderate without psychotic features, and generalized anxiety disorder along Axis I. She felt Claimant's prognosis was poor. (Tr. at 273-74).

Candace Mihm, Ph.D., completed a Psychiatric Review Technique on December 7, 2012. (Tr. at 71-72). The criteria of listings included affective, anxiety-related, and somatoform disorders. Dr. Mihm found Clamant had mild restrictions of activities of daily living and in maintaining concentration, persistence, and pace; however, he had no restrictions with social function and no episodes of decompensation. (Tr. at 71). She felt the evidence did not establish the presence of the paragraph "C" criteria. Dr. Mihm noted that Claimant was prescribed Celexa from 2006 through 2012 and had undergone a depression screening in August 2012, which was negative. Dr. Mihm found Claimant's allegations to be partially credible in that he had a medical history of treatment for depression at the VAMC, although PTSD was not referenced in those medical records. Claimant's mental status examination and MCE were grossly intact and he had a negative depression screening in 2012. Dr. Mihm found Claimant's activities of daily living were primarily limited due to physical limitations as his psychiatric symptoms were not

significantly limiting. Consequently, Dr. Mihm opined that Claimant's mental issues were non-severe. (Tr. at 72).

On December 13, 2012, Deidre Parsley, D.O., completed an Internal Medicine Examination at the request of the West Virginia Disability Determination Service. (Tr. at 1147-54). Claimant's chief complaints included chronic bilateral ankle and shoulder pain, status post right rotator cuff repair and reconstruction, subacromial arthroscopy with excision of the distal clavicle and debridement, chronic low back pain, shortness of breath, obstructive sleep apnea, and chest pain. (Tr. at 1147). Claimant's medication regimen included Paroxetine, hydrochlorothiazide, omeprazole, loperamide, lorazepam, hydrocodone, metoprolol and etodolac. (Tr. at 1148).

Upon examination, Claimant weighed two hundred sixty-nine pounds and was six feet one inch tall. His visual acuity measured 20/25 in both eyes without correction. Claimant's blood pressured measured 130/92. Although he did not require a handheld assistive device, Claimant walked with a limping gait. Claimant appeared stable at station and comfortable in both supine and sitting positions. He did not require any assistance getting on or off the examining table. Pulmonary examination showed no increase in the AP diameter and the lungs were clear to auscultation, bilaterally. There was no shortness of breath with exertion or when lying flat. The elbows and wrists appeared non-tender; however, there was tenderness at the anterior, posterior, and AC joint of the right shoulder and the AC joint of the left shoulder. There was decreased range of motion of the bilateral shoulders. There did not appear to be any redness, warmth, swelling or nodules. There was no atrophy of the hands. Claimant could make a fist bilaterally, write and pick up coins without difficulty. There was no tenderness, warmth, swelling, fluid, laxity or crepitus of the knees, ankles, or feet other than there was tenderness of the lateral

malleolus bilaterally. There appeared decreased range of motion of the ankles. The cervical spine appeared normal. The dorsolumbar spine exhibited normal curvature. Straight leg-raising test in the seated position was normal. In the supine position, there was back pain at eighty degrees on the right and seventy degrees on the left. Claimant could stand on one leg at a time without issue. Muscle strength of both upper and lower limbs measured 4/5 bilaterally. There did appear decreased sensation to light touch, pinprick, and vibration of the bilateral distal legs to the feet. Hoffman and Babinski's signs were negative. Claimant could walk on the heels and toes and was able to perform tandem gait and squat without issue. (Tr. at 1151).

Dr. Parsley assessed Claimant with chronic lumbalgia; chronic bilateral ankle and shoulder pain, status post right rotator cuff repair and reconstruction and status post right subacromial arthroscopy with excision of the distal clavicle and debridement; history of degenerative joint disease of the bilateral ankles; shortness of breath; history of obstructive sleep apnea; chest pain of unclear etiology; history of depression; and hypertension. (Tr. at 1152). Dr. Parsley opined in connection with Claimant's ability to do work-related activities that, without interruption, and limited by Claimant's lumbalgia, shortness of breath and bilateral ankle and shoulder pain, he could reasonably be expected to stand for one hour, walk for an estimated one hundred minutes, lift and carry up to twenty pounds frequently and twenty-one to thirty pounds occasionally. Because Claimant exhibited decreased range of motion of the bilateral shoulders, activities involving reaching overhead should be avoided. Dr. Parsley felt Claimant's ability to sit, bend, squat, stoop, kneel, crawl, see, hear, speak, travel, push and/or pull, and handle objects, were not significantly affected by his medical conditions. (Tr. at 1153).

On February 8, 2013, Pedro F. Lo, M.D., completed a Residual Functional Capacity

Assessment. (Tr. at 73-5). Dr. Lo found Claimant could occasionally lift and/or carry fifty pounds, frequently lift and/or carry twenty pounds, stand, walk or sit about six hours in an eight-hour workday and had unlimited ability to push and/or pull. (Tr. at 73). Claimant could frequently climb ramps, stairs, ladders, ropes, and scaffolds, balance, stoop, kneel, crouch and crawl. (Tr. at 74). In explaining his postural findings, Dr. Lo noted Claimant walked with a limp; however, Claimant did not require a handheld assistive device to aid in ambulation. Dr. Lo observed that at his consultation examination, Claimant was comfortable in both the seated and supine position and he could get off and on the exam table without assistance. Straight leg-raising was normal while seated and although the supine position produced pain, there was no radicular irritation. Claimant had muscle strength of 4/5 bilaterally in both upper and lower extremities with mild decreased sensory to the distal legs and feet, but was otherwise normal. An MRI of the lumbar spine taken in March 2012, showed minimal disk desiccation without loss of height. There were no other significant or focal abnormalities. Dr. Lo felt Claimant had limited manipulative ability in reaching in any direction on the right in front and/or laterally, and left and right overhead; however, his handling, fingering, and feeling were unlimited. (Tr. at 74). Claimant had no visual or communicative limitations. (Tr. at 75). As to environmental limitations, Claimant had unlimited ability to exposure to wetness, humidity, or noise; however, he should avoid concentrated exposure to extreme cold or heat, vibration, fumes, odors, dusts, gases, poor ventilation, and hazards, such as machinery or heights. By way of additional explanation, Dr. Lo noted Claimant had obstructive sleep apnea which improved with use of CPAP. Claimant's complaint of chest pain was of unclear etiology; his IBS was not well established as he had no history of weight loss; and in the face to face interview with the consultative examiner, Claimant had no observed

difficulties. As a result, Dr. Lo found Claimant had the residual functional capacity for medium work. He also found Claimant partially credible.

Holly Cloonan, Ph.D., completed a Psychiatric Review Technique on February 22, 2013. (Tr. at 81-4). Dr. Cloonan found Claimant had mild limitations with restriction of activities of daily living and maintaining social function; however, he had moderate limitation in maintaining concentration, persistence or pace. (Tr. at 82). Dr. Cloonan found the evidence did not establish the paragraph "C" criteria. Under the additional explanation portion of the form, Dr. Cloonan reported that although Claimant did not complain that his mental condition was getting worse, the consultative examination as well as medical records from the VAMC were consistent in documenting psychiatric symptoms. Based upon the records in the file, Dr. Cloonan opined that Claimant's pain and psychiatric symptoms would interfere with some of his mental functional capacity over the course of a typical workday. (Tr. at 83). Dr. Cloonan found Claimant's allegations not fully credible based on the alleged symptoms and subsequent alleged disability as it was not consistent with the medical evidence; however, from a mental perspective, Dr. Cloonan found Claimant credible in the allegation of some impairment in his mental functional capacity, which was supported by the medical records, received from both the consultative examiner and Claimant's treating sources. (Tr. at 84).

Dr. Cloonan also completed a Mental Residual Functional Capacity Assessment. (Tr. at 86-88). She found Claimant not significantly limited in his ability to understand and remember very short and simple instructions or understand and remember detailed instructions; however, she found Claimant moderately limited in his ability to remember locations and work-like procedures. Claimant was not significantly limited in his ability to carry out very short and simple or detailed instructions, perform activities within a

schedule, maintain regular attendance and be punctual within customary tolerances, sustain an ordinary routine without special supervision, work in coordination with or in proximity to others without being distracted by them and make simple work-related decisions; however, Claimant was moderately limited in his ability to maintain attention and concentration for extended periods and complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods. (Tr. at 87-88). Dr. Cloonan felt Claimant had no social interaction limitations or adaptation limitations. Dr. Cloonan explained her findings by opining that Claimant had the ability to learn, remember, and perform routine work-like activities at a reasonable pace in settings where there were few distractions that did not require meeting production line schedules. (Tr. at 88).

On February 22, 2013, Subhash Gajendragadkar, M.D. completed a Physical Residual Functional Capacity Examination. (Tr. at 84-6). He found Claimant could occasionally lift and/or carry fifty pounds, frequently lift and/or carry twenty pounds, stand, walk or sit about six hours in an eight-hour work day and had unlimited ability to push and/or pull. (Tr. at 84). Claimant could frequently climb ramps, stairs, ladders, ropes, and scaffolds, balance, stoop, kneel, crouch and crawl. Claimant had manipulative limitations in reaching in any direction on the right in front and/or laterally, left and right overhead; but otherwise, Claimant had unlimited ability to handle, finger or feel. (Tr. at 85). Claimant had no visual or communicative limitations. Claimant had unlimited ability for exposure to wetness, humidity, or noise; however, he should avoid concentrated exposure to extreme cold, heat, vibration, fumes, odors, dusts, gases, poor ventilation and hazards, such as machinery or heights. Dr. Gajendragadkar affirmed Dr. Lo's PRFC

examination as written. (Tr. at 86).

## VI.   **Scope of Review**

The issue before the Court is whether the final decision of the Commissioner is based upon an appropriate application of the law and is supported by substantial evidence. *See Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990). In *Blalock v. Richardson,* the Fourth Circuit Court of Appeals defined "substantial evidence" to be:

> [E]vidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance. If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is "substantial evidence."

*Blalock*, 483 F.2d at 776 (quoting *Laws v. Celebrezze*, 368 F.2d 640, 642 (4th Cir. 1966)). When examining the Commissioner's decision, the Court does not conduct a *de novo* review of the evidence to ascertain whether the claimant is disabled. *Johnson v. Barnhart,* 434 F.3d 650, 653 (4th Cir. 2005) (citing *Craig v. Chater,* 76 F.3d 585, 589 (4th Cir. 2001)). Instead, the Court's role is limited to insuring that the ALJ followed applicable regulations and rulings in reaching his decision, and that the decision is supported by substantial evidence. *Hays v. Sullivan,* 907 F.2d 1453, 1456 (4th Cir. 1990). If substantial evidence exists, the Court must affirm the Commissioner's decision "even should the court disagree with such decision." *Blalock,* 483 F.2d at 775*.*

## VII.   **Discussion**

Claimant alleges that the ALJ's decision is based on an erroneous application of the prevailing law of this circuit given that the ALJ (1) failed to afford the VA disability ratings the requisite "substantial" weight, and (2) failed to explain how the record clearly demonstrated that such a deviation was warranted. Claimant relies upon *Bird v. Commissioner of Soc. Sec.*, 699 F.3d 337 (4th Cir. 2012) in support of his request for

remand.

In *Bird,* the Fourth Circuit discussed the role that VA disability ratings should play in the SSA's disability determination process. To begin, the Fourth Circuit confirmed the basic rule that other agency decisions, while not binding on the SSA, "cannot be ignored and must be considered" when evaluating a claimant's eligibility for social security disability benefits. *Id.* at 343 (citing *DeLoatche v. Heckler,* 715 F.2d 148, 150 n. 1 (4th Cir. 1983) and SSR 06-03p, 2006 WL 2329939, at *6 (Aug. 9, 2006)).[3] With respect to the VA, the Fourth Circuit acknowledged that it had never explicitly addressed the precise weight the SSA should afford to VA disability ratings. Reviewing the law of other jurisdictions, the Fourth Circuit pointed out that varying degrees of deference had been given to the VA's determinations. The Fourth Circuit reasoned that even though courts differed on the amount of weight to give, "[t]he assignment of at least some weight to a VA disability determination reflects the fact that both the VA and Social Security programs serve the same governmental purpose of providing benefits to persons unable to work because of a serious disability." *Id.* The Court added, "[b]oth programs evaluate a claimant's ability to perform full-time work in the national economy on a sustained and continuing basis; both focus on analyzing a claimant's functional limitations; and both require claimants to present extensive medical documentation in support of their claims."

---

[3] SSR 06-03p provides *inter alia*:

> Under sections 221 and 1633 of the Act, only a State agency or the Commissioner can make a determination based on Social Security law that you are blind or disabled. Our regulations at 20 CFR 404.1527(e) and 416.927(e) make clear that the final responsibility for deciding certain issues, such as whether you are disabled, is reserved to the Commissioner (see also SSR 96-5p, "Titles II and XVI: Medical Source Opinions on Issues Reserved to the Commissioner"). However, we are required to evaluate all the evidence in the case record that may have a bearing on our determination or decision of disability, including decisions by other governmental and nongovernmental agencies (20 CFR 404.1512(b)(5) and 416.912(b)(5)). Therefore, evidence of a disability decision by another governmental or nongovernmental agency cannot be ignored and must be considered.

*Id.* (citing *McCartey v. Massanari,* 298 F.3d 1072, 1076 (9th Cir. 2002)). Noting that "the purpose and evaluation methodology of both programs are closely related," the Fourth Circuit concluded that "a disability rating by one of the two agencies is highly relevant to the disability determination of the other agency." *Id.* Consequently, the Fourth Circuit mandated as follows:

> [I]n making a disability determination, the SSA must give substantial weight to a VA disability rating. However, because the SSA employs its own standards for evaluating a claimant's alleged disability, and because the effective date of coverage for a claimant's disability under the two programs likely will vary, an ALJ may give less weight to a VA disability rating when the record before the ALJ clearly demonstrates that such a deviation is appropriate.

*Id.*

Here, the ALJ never mentioned Claimant's VA disability ratings in the written decision. Consequently, the ALJ failed to comply with SSR 06-03p and with the Fourth Circuit's directive in *Bird.* Contrary to the Commissioner's contention, the ALJ's boilerplate statement that he made a "careful consideration of the entire record," does not suffice as evidence that the ALJ evaluated the VA disability ratings.

The Commissioner argues that Claimant's VA ratings were assigned years before his alleged onset of disability; accordingly, the ALJ was not required to give the ratings much weight. According to the Commissioner, the ALJ articulated a perfectly valid reason for discounting the "remote" records; namely, that Claimant was working full time when the partial disability rating was given by the VA and, thus, he was not eligible for DIB. However, this explanation for the ALJ's error does not pass muster. Although the VA first correlated Claimant's various impairments with percentages of disability prior to May 2012, Claimant's ratings persisted into the period of disability alleged in this action and were increased in January 2013. Accordingly, the ALJ should have examined the ratings,

considered the relevant records, and determined the basis for the VA's disability findings. Moreover, the Commissioner's explanation ignores the ALJ's regulatory duty to develop Claimant's medical history "for at least the 12 months preceding the month" in which he filed his application, and longer if "there is a reason to believe that development of an earlier period is necessary." 20 C.F.R. § 404.1512. In this case, viewing the records longitudinally is especially important, because some of the conditions that plague Claimant—like degenerative joint disease and arthritis—tend to be progressive in nature. Without fully considering the available evidence reflecting the onset and development of Claimant's conditions, the ALJ could not properly analyze their evolution and impact on Claimant's functional abilities. Furthermore, because the ALJ never explicitly addressed the VA's findings, it is impossible for this court to determine what weight the ALJ gave to the ratings that were in place 2012 through 2014 and the reasons for the weight given to them.

The Commissioner also contends that the ALJ did not err in failing to weigh the VA disability ratings, because the VA found Claimant to be only partially disabled. The Commissioner points out that the SSA has no equivalent to the VA's partial disability determination. The Commissioner emphasizes that the claimant in *Bird* was determined to be fully disabled by the VA, making the VA's disability determination useful to the SSA's evaluation; in contrast, Claimant was not found fully disabled by the VA. For that reason, the Commissioner claims that the *Bird* decision is not controlling; indeed, it is inapposite.

The undersigned agrees that the SSA has no partial disability rating comparable to that of the VA. However, the plain language of SSR 06-03p makes clear that even partial disability ratings by other agencies are to be considered and weighed by the ALJ in determining disability under the Social Security Act. SSR 06-03p states, *inter alia*, the

following:

> Under sections 221 and 1633 of the Act, only a State agency or the Commissioner can make a determination based on Social Security law that you are blind or disabled. ... However, we are required to evaluate all the evidence in the case record that may have a bearing on our determination or decision of disability, including decisions by other governmental and nongovernmental agencies (20 CFR 404.1512(b)(5) and 416.912(b)(5)).
> ...
>
> These decisions, and the evidence used to make these decisions, may provide insight into the individual's mental and physical impairment(s) and ***show the degree of disability determined by these agencies based on their rules.***

SSR 06-03p, 2006 WL 2329939, at *6-7 (emphasis added). Obviously, the SSA envisioned that disability ratings provided by other agencies might include degrees of disability less than one hundred percent. Whether the other agencies recognize gradations of disability is unimportant. Rather, the point of this Ruling is to remind adjudicators that they gain "insight into the [claimant's] mental and physical impairments" by carefully considering the conclusions of other agencies and, thus, are required to evaluate and weigh them.

The Fourth Circuit relied heavily upon the regulations and SSR 06-03p in deciding *Bird.* Accordingly, while the claimant in *Bird* was fully disabled by the VA, nothing in the Fourth Circuit's opinion indicates an intent to limit the ALJ's mandatory duties under SSR 06-03p to disability ratings of one hundred percent. This interpretation of *Bird* is consistent with the opinions other courts in this circuit. *See, e.g., Olgesby v. Colvin,* No. 5:15-cv-023, 2016 WL 4445773, at *4-6 (W.D.N.C. Jun. 9, 2016) (finding that ALJ properly considered VA's 70% disability rating); *Dixon v. Colvin,* No. 7:15-CV-221-BO, 2016 WL 3080795, at *2 (E.D.N.C. May 31, 2016) (finding that ALJ failed to comply with *Bird* in assessing 80% VA disability rating); *Sims v. Colvin,* No. 2:14-CV-03005-TLW,

2015 WL 5474760, at *5-6 (D.S.C. Sept. 17, 2015) (finding that remand was appropriate when ALJ failed to properly weigh 80% VA disability rating); *Kinney v. Colvin,* CIV.A. 2:14-13626, 2015 WL 4253878, at *16 (S.D. W. Va Jul. 13, 2015) (finding ALJ erred by failing to weigh 90% VA disability rating); *Powers v. Colvin,* 1:14CV272, 2015 WL 213189, at *6-8 (M.D.N.C. Jan. 14, 2015) (finding error when ALJ failed to consider partial disability rating given by the VA 2008); *Lamb v. Comm'r, Soc. Sec.,* No. Civ. GLR-14-0886, 2014 WL 5704905, at *2 (D. Md. Nov. 4, 2014) (finding error where ALJ failed to consider 40% disability rating from the VA, because "nothing in the *Bird* opinion limits its dictates to a full, as opposed to a partial, disability rating) (citing *Carter v. Colvin,* No. 5:12-cv-736-FL, 2014 WL 351867, at *4 (E.D.N.C. Jan. 31, 2014) (rejecting a harmless error argument where the ALJ failed to consider a 10% disability rating)). Consequently, the undersigned rejects the Commissioner's argument on this point as unpersuasive.

Next, the Commissioner asserts that *Bird* does not require remand in the instant action, because, unlike the rating in *Bird,* Claimant's VA disability rating was initially rendered in the 1990s, making it remote and irrelevant to the period of alleged disability. This contention has no merit. Claimant underwent several C&P examinations over the years and maintained his 70% disability rating through 2012. In January 2013, the VA increased his service-connected disability rating to 80%. The ALJ was mandated, at a minimum, to consider the period between September 2011 through April 30, 2014, the date of the ALJ's written decision. As such, Claimant's VA disability rating, which existed and was increased during the relevant period, should have been considered by the ALJ.

The Commissioner also raises as an argument against remand the fact that Claimant has never supplied the Ratings Decision from the VA. Citing to *Rodgers v. Colvin*, the Commissioner insists that without the Ratings Decision, the ALJ cannot be

faulted for failing to discuss Claimant's VA disability ratings. *Id.,* No. 5:13-cv-345-D, 2015 WL 636061, at *7-8 (E.D.N.C. Feb. 13, 2015). In *Rodgers,* the United States District Court for the Eastern District of North Carolina held that remand was not appropriate despite the ALJ's failure to give substantial weight to a VA disability rating. The Court found that because the Rating Decision was not in evidence, and the records supplied contained only passing references to the Claimant's numerical VA disability rating, the ALJ did not err in giving the VA's 50% disability rating little weight. *Id.* at *9.

What the Commissioner fails to appreciate, however, is that the ALJ in *Rodgers* did consider the VA's rating. On the other hand, here, the ALJ made no mention of Claimant's VA disability ratings at all. In addition, the Court in *Rodgers* remarked on the paucity of medical evidence underlying the VA disability rating. In contrast, Claimant produced multiple C&P examinations, which would have been used by the VA in reaching its disability ratings. Certainly, the undersigned agrees with the Commissioner that the Ratings Decision should have been tendered by Claimant or his counsel to the ALJ. However, the record plainly showed Claimant's VA disability rating and the percentages given to each condition. The records supplied by the VA contained much, if not all, of the treatment and assessments underlying the VA's determination. Accordingly, the ALJ had sufficient information to comment on and weigh the VA's disability ratings.

Finally, the Commissioner contends that any error by the ALJ was harmless, because he fully discussed the medical evidence, including the evidence that supported the increased disability rating in 2013. The undersigned disagrees that discussing some of the medical evidence supplied by the VA fulfills the ALJ's duty to consider and weigh VA disability ratings. The Fourth Circuit explained that an ALJ should give the VA's disability determinations substantial weight unless the record before the ALJ clearly

demonstrates that less weight is appropriate. Because the ALJ failed to explicitly weigh the VA's ratings in Claimant's case, and failed to explain the reasons for discounting the VA's ratings, the error requires remand. Otherwise, the court would be forced to perform the analysis that should have been done by the ALJ in the first place. Weighing evidence is not a task with which this court is charged; accordingly, the case must be returned to the SSA so that it can properly carry out its statutory function. *See Jones v. Colvin,* 7:14-CV-252-BO, 2015 WL 7451338, at *2 (E.D.N.C. Nov. 23, 2015) (finding that failure of the ALJ to explain the consideration given to a VA disability rating required remand as the court was precluded from conducted "meaningful review" of the decision); *Powers,* 2015 WL 213189, at *7 (rejecting the Commissioner's argument that remand for failure of the ALJ to consider VA disability ratings was futile and finding that the failure was a "serious procedural error" preventing proper judicial review); *Carter,* 2014 WL 351867, at *4 (finding the ALJ's failure to consider a 10% VA disability rating was not harmless error, because the court could not engage in "post-hoc rationalization" to explain the treatment of the evidence when the treatment was not clear form the record); *Lamb,* 2014 WL 5704905, at *2 (holding that, without an analysis of the VA's partial disability rating by the ALJ, the court cannot find that the Commissioner's decision is supported by substantial evidence); *Hoog v. Colvin,* No. 15-9123-SAC, 2016 WL 4593479, at *3 (D. Kan Sept. 2, 2016) (holding that "the failure to consider the VA disability rating is not harmless error."); *McCaa v. Astrue,* No. Civ.A 09-72-SCR, 2010 WL 1533287, at *6 (M.D. La. Apr. 14, 2010) (finding the "the ALJ's legal error in failing to consider and weigh the disability rating by the VA is not a situation where the principle of harmless error can be applied or where benefits can be automatically awarded.")

33

## VIII.  <u>Recommendations for Disposition</u>

Based on the foregoing, the undersigned United States Magistrate Judge respectfully **PROPOSES** that the presiding United States District Judge confirm and accept the findings herein and **RECOMMENDS** that the presiding District Judge **GRANT** Plaintiff's Motion for Judgment on the Pleadings, to the extent that it requests remand of the Commissioner's decision, (ECF No. 11); **DENY** Defendant's request to affirm the decision of the Commissioner, (ECF No. 12); **REVERSE** the final decision of the Commissioner**; REMAND** the matter for further proceedings pursuant to sentence four of 42 U.S.C. § 405(g); and **DISMISS** this action**, with prejudice,** and remove it from the docket of the Court.

The parties are notified that this "Proposed Findings and Recommendations" is hereby **FILED**, and a copy will be submitted to the Honorable John T. Copenhaver, Jr., United States District Judge. Pursuant to the provisions of Title 28, United States Code, Section 636(b)(1)(B), and Rules 6(d) and 72(b), Federal Rules of Civil Procedure, the parties shall have fourteen days (filing of objections) and three days (if mailed) from the date of filing this "Proposed Findings and Recommendations" within which to file with the Clerk of this Court, specific written objections, identifying the portions of the "Proposed Findings and Recommendations" to which objection is made, and the basis of such objection. Extension of this time period may be granted by the presiding District Judge for good cause shown. Failure to file written objections as set forth above shall constitute a waiver of *de novo* review by the District Court and a waiver of appellate review by the Circuit Court of Appeals. *Snyder v. Ridenour*, 889 F.2d 1363 (4th Cir. 1989); *Thomas v. Arn*, 474 U.S. 140 (1985); *Wright v. Collins*, 766 F.2d 841 (4th Cir. 1985); *United States v. Schronce*, 727 F.2d 91 (4th Cir. 1984). Copies of such objections shall be

34

provided to the opposing party, Judge Copenhaver and Magistrate Judge Eifert.

The Clerk is directed to file this "Proposed Findings and Recommendations" and to provide a copy of the same to counsel of record.

**FILED**:  December 14, 2016

Cheryl A. Eifert
United States Magistrate Judge